The next case for argument is the State of Gabriel Strickland v. Nevada County. Counsel, can all three of you hear me? Yes, this is Attorney Patrick Dwyer representing the appellants, and I can see and hear everyone. Okay, great. And the other two, can you hear me and see me as well? Yes, Your Honor. Great. Yes, Your Honor. Great. Mr. Proceed. Good morning, and I will begin with a basic opening statement, but I kind of expect to jump in and ask questions, and please go ahead. The case involves the tragic death of Gabriel Strickland, as the appellants allege, that due to the inappropriate use of deadly force. Mr. Strickland, on the morning of January 1, 2020, was experiencing a mental health crisis. Officers were called. He was surrounded. He was out in the open. Instead of trying to de-escalate, they immediately, almost immediately, accelerated or escalated the situation to a direct assault on Mr. Strickland using assault rifles. Unfortunately, there was a tragic death, and he was shot to death. As the appellants set forth in their complaints, there was no imminent threat and no urgency to the situation. Gabriel Strickland had not committed any crime, and the officers were not called to stop a crime. Gabriel Strickland stood calmly and in the middle of the street. It was a residential street. He was in plain view. When the officers arrived, he never tried to flee. He never brandished the weapon at them or anyone else in the neighborhood. How is that true? He had a gun out in the open. He held it upright. Wasn't that brandishing it? He did not brandish the weapon at anyone. The only time the weapon was actually brandished was in the final moment just before he was shot. You're defining brandish as pointing it at someone versus... Yes. Oh, okay. He was holding it in ways that were not threatening, so brandishing may mean in a threatening manner. Okay. At the beginning of the incident, Gabriel told the officers it was a toy gun. He pointed to the orange tip on the gun. The officers responded, we see that, but we don't know that that isn't painted on. The officers all knew Gabriel Strickland. They knew him personally. In fact, there's audio of them calling out his name. They knew his mental health history, and they knew his criminal history. Counsel, what does that go to? What that goes to is the officers needing to establish situational control. They knew this person had mental health problems, had a history of encounters with law enforcement. They needed to, in their minds, set up what they were going to do to resolve the situation. They needed to find out if the gun was... I think, but from the officer's perspective, the first thing they wanted to do was just put it on the ground. The fact that they knew that he had mental problems, of course, might only heighten their anxiety that he might not be fully aware of what was going on and that he might pop off at any time. It's an unfortunate situation. I think the officers came in with language and yelling that probably was not designed to defuse the situation, fault the officers for that, but very difficult when he refuses to comply and put the gun on the ground, and then branches it at them to fault the officers for defending themselves. Your Honor, I don't disagree with what you're saying, but there are additional facts that were alleged. What's important here to note is that there are lots of policies and procedures in existence that they could have followed that would have prevented this situation. And the policies and procedures, does the violation of internal policies and procedures violate the Constitution? There are several cases in the Ninth Circuit which indicate that, yes, policy, when the officers don't follow policies to de-escalate, and then they do escalate, when they could have avoided the use of deadly force, yes, those officers can be held liable for failure to do that. And I can get those cases for you, but they're in my brief. I cite those. I'm just trying to figure out, that may be a matter for internal police discipline, but I'm not sure why that amounts to a constitutional violation. The constitutional standards, I would have thought, would have come from cases involving deadly force. Well, these cases, the case I'm speaking about, did involve deadly force, and the officers who didn't follow procedures and how to respond to someone similar to Mr. Gabriel was having a crisis. And they didn't follow policies. As a result, the situation was escalated, deadly force resulted. What we need to do here is look at the totality of the circumstances, not just the last moment. Counsel, I have a couple of procedural questions. There's a video of the incident, correct? Is it your view that we can view that video or not? The video that was posted online, which is linked in the brief submitted by the appellees, is not appropriate material to be evaluated. The reason is, it was created by the appellees under their direction. It is a composite video of a number of pieces of body cams, et cetera, cruiser videos. And from having, all I can say as representative of the court, having looked at all the video now that it was turned over shortly before this motion to dismiss was decided, it's very clear that this was cut and edited to show the situation in the most favorable light. Did the district court view the video? I don't know, Your Honor. I don't know whether they physically, whether judging them physically viewed it or not. He doesn't mention it. In my view, if the district court viewed it, then we could view it. But if he didn't, we should not either. But he does not mention his decision. He made some reference to it. He relies strictly on the First Amendment complaint. And then my second question is, is the gun, a picture of the toy gun in the record? I couldn't see it. No, it was not. Okay. What we're dealing with here are the allegations from the First Amendment complaint where we have a partial transcript that's cited where Gabriel Strickland says it's a toy gun and the officers are heard saying, we can see the orange tip, but we don't know if that's painted on. So again, going back to the problem here is, what are officers supposed to do? There was no urgency. They had all the time they needed. They needed 10, 15 minutes to talk to Gabriel and to putting down the gun. They had 15, 20 minutes. If they weren't experienced at negotiating or how to handle the situation, they simply needed to radio in and have commanding officers or negotiating team come in. He was contained. He wasn't going anywhere. There was situational control. If they weren't trained and didn't feel qualified to resolve the thing peaceably, they needed to let their commanding officers or spear officers come in and take charge. In fact, unfortunately, we didn't get a chance to get these facts into the First Amendment complaint, but there will be evidence of trial if we get there showing that the sergeant for the Grand Valley PD was in fact about 100 feet away and just come. He was very experienced. He was almost prepared to take situational command when gunfire started. Another moment, another one minute of calm, patience, and thoughtfulness wouldn't prevent any death. I do understand the court's concern because it's very legitimate. Officers have to be able to defend themselves. In split-second situations where they suddenly are surprised by a weapon or circumstance, they have every right to defend themselves with deadly force if necessary. That's not this case. Gabriel Strickland never threatened them. He never challenged them. He never tried to flee. There was no crime. There were no other civilians in the circumstances to be concerned about. The street was empty, so he's had them surrounded. Well, obviously then, when an individual points a gun in an officer's direction, the law clearly establishes that the Constitution entitles the officer to respond with deadly force, correct? Well, that has to be looked at very carefully. Isn't your argument predicated, following up upon Judge Bobby's earlier question, isn't your argument really predicated upon the steps taken prior to the gun being pointed at officers? Well, I think it's very important to make, in deciding this case, your honors, to look at the element of surprise. So, in the cases cited by the appellate, and they're good cases, in particular the A. Passage v. McEnary, I believe I have that pronounced right, that's the case that really is the most difficult for appellants. I'll be blunt with the court. It's out of the Eighth Circuit from Missouri, but what's important about that case, which distinguishes from these circumstances, is that there was an element of suddenness and surprise. The officers were, had, the decedent in that case, had pointed the gun a couple times at officers. It was the third or fourth time he pointed the gun that they finally shot him. Here, Gabriel Strickland never pointed the gun to anyone, and would not have pointed the gun at anyone, had the officers not taken the very poor tactic of marching down on him. That's the thrust of my question, I think. Again, I think that's what Judge Bobby was trying to get to, is that clearly, once the gun is pointed at the officers, they don't have time to decide whether or not it's a BB gun or it's a real gun. There's a gun being pointed at the officer. The thrust of your argument is in terms of the insufficiency of steps being taken prior to that. Essentially, that the situation escalated, and your argument is that the police did not take appropriate steps to de-escalate. Isn't that the thrust of your argument? That's one part of your argument. Well, let me just continue. If that's the case, then, just let me follow up. If that's the case, then how does that amount to a constitutional violation? That may be a procedural step, and it may be in terms of appropriate police training or what has occurred or not occurred in terms of de-escalation, but how does that amount to a constitutional violation that they didn't take the appropriate steps to de-escalate? Well, I think the Constitution requires the use of force to be reasonable. Use of force cannot be reasonable if police immediately ignore all of the tools at their command and immediately escalate to using deadly force. That's what happened here. The police ignored all of the good things they could have done, all the things to gain situational control, and they forced the situation. They precipitated it. It's also very important here, and again, this is unfortunately if this case came up on a motion to dismiss rather than summary judgment. Again, I can represent to the court that I have looked at the video, and at the last moment, Officer Ball put away his gun, took out his baton because he obviously, and you could see this, was a toy gun, and he swatted the gun out of the hands of Gabriel Strickland. Fortunately, he got out of the way because almost at the exact moment, the other officers, Hooper and Tripp and King, let loose at about 10, 15 feet range and killed Gabriel Strickland. Officer Ball almost got killed, but he understood this was not a serious threat. He just swatted the toy gun away with his baton, knocked it down in the street. There's a lot of evidence and facts yet in this case. This was just premature. We're on a motion to dismiss. There's a discovery to be done. It's very difficult on the motion to dismiss, counsel, when in your complaint in Paragraph 60, you said that Gabriel Strickland continued to hold the toy gun, sometimes pointing it in the direction of Defendants Brandon Tripp, Brian Hooper, and Conrad Ball. That's pretty tough to get around that. I mean, I think that's a candid admission on your part. I commend you for accurately representing what happened, but that's pretty tough when the complaint itself admits that he pointed the gun at the officers. Well, Your Honor, that occurred well before they got close to him, even before they started marching in. He was just kind of holding the gun, kind of standing. Most of the time, he was holding it up. Occasionally, he'd point it in different directions. He didn't make a deliberate point. Is your argument that he did not point the gun at the officers immediately prior to them firing? He did point in the final moment. As they got to about 15 feet, he knelt down. The video posted online, he kneels down. He's clearly going into a submissive position. He doesn't know what to do. He's mentally confused. He's holding on to this gun like it's his only teddy bear to protect himself. He goes down to his knees. It's pitiful. They don't stop. They keep yelling at him. Finally, he just mentally gives up and lowers his gun. They just shoot him. It was sad. They just needed to stop, calm down, and back off a bit and talk to him to work this out. It was unnecessary to use any force at that moment. Counsel, do you want to save some time for a rebuttal? Yes. Okay. Whoever's going first from... Yes, Your Honor. John Whitesides for the city defendants and I with a little more officer-specific approach and address an issue that has newly arisen by virtue of the appellant's reply brief. To set the background very quickly for this, the appellants admit that neither Officer Grube nor Officer Ball fired their weapons. Therefore, the only theory of liability against either of those officers is failure to intervene to prevent the officers who did shoot from shooting. This argument was advanced in the opening brief at pages 45 to 46 using counsel's pagination and that'd be starting at page 53 using the clerk's pagination. We responded on the merits and this would be at docket number 17 in the answering brief at pages 18 to 19 of counsel's pagination as to Ball and Grube and explained why substantively the failure to intervene theory lacked merit. In the reply brief, which is number 21 on the docket, at page 7 of counsel's pagination, page 13 by the clerk, is the following and I'll quote. This is at heading 3. The district court did not rule on whether Officer Grube and Ball failed to intercede. The district court did not rule on whether GVPD officers Grube and Ball could be held liable for failing to intercede to stop the shooting of Gabriel by NCSD deputies Tripp and King and GVPD officer Hooper. Appellants did not raise this as an issue on appeal and appellees never moved to include this as an issue on appeal. Accordingly, this issue is not properly before the court. End of quote. So as rather fantastic and inconsistent those statements are relative to what was in the prior briefs, I would propose to the court that as to Officers Grube and Ball, the appeal has effectively been a statement in the reply that the issue as to their liability is not properly before the court. Turning now to some of the points that were made in the opening argument, Judge Bybee was absolutely correct in saying that any kind of policy or procedure violation, which by the way the record does not show, but even if there was one, that's a disciplinary matter. That's a labor matter. There is no case from this circuit that says that per se an internal procedural violation somehow violates the constitution. For example, let's suppose that the agency had a rule that said you could never use deadly force unless deadly force is actually used against you first. And an officer after a gun was pointed at him did not wait for it to be discharged, but instead fired his weapon. That would be a policy violation, but it wouldn't be a constitutional violation. So that is not the proper analysis. Turning to the next point, Judge Bumate asked about the video. Well, normally you would be correct that you wouldn't be able to consider such an extrinsic matter on a pleading attack, but here we're in a different mode because of the complaint itself. And if we look at the record at ER 70, which is paragraph 68 of the first amended complaint, we have the statement, and I will quote, the quotations used in paragraph 69 to 87 were taken from a video of the events prepared by defendants Nevada County and City of Grass Valley that was published online. So here we have an incorporation by reference of the video that the defendants compile. And what ER was that? Did you say 70? Correct. ER 70. So here the plaintiff expressly relies on it in the factual allegations. Therefore, it is properly before the court and should be considered. There is no allegation in here that it's inaccurate or, you know, in contrast to what it shows, the real events were as follows. That would be different. Do you know if the district court reviewed the recording? There is no way to know. There's no indication on the record whether it did or didn't. Well, we do have a footnote. Footnote five of the magistrate's report does say the following facts are based on quotations, quote, taken from a video. So the magistrate seemed to have acknowledged that it did come from a video, did not say the court had viewed it. And the district court does not in his order. That is correct. So but clearly the court could have viewed it. Whether it chose to or not, we'll never know. But it was perfectly entitled to, given the express incorporation by reference. And it's no different procedurally than if it was attached as an exhibit to the complaint in a written transcript. At that point, this court would have no hesitancy in looking at the document, regardless of whether the district court had, because it would be part of the record that could support affirmance. And again, whether the doesn't mean that it can't be considered if it supports affirming the judgment. We evaluate the bottom line, not the reasoning. The next point that was made was that this was a situation of surprise. That's an interesting comment. That's the type of analysis that's normally reserved for a plainclothes officer who approaches a civilian with a weapon out, where the civilian has no way to know who he's dealing with. Or an entry into an occupied dwelling at night without knock and announce, where once again, the citizen has no way of knowing who he's dealing with. Here, we're in broad daylight with numerous plainclothes officers. A counsel in his brief admits that there were lights and sirens on marked patrol cars. So there's no surprise here. He knows exactly who he's dealing with. The next statement that we took issue with in the answering brief was that there were no crimes being committed. And we went ahead and went through the analysis as to which crimes were being committed. And in the reply, the plaintiff submitted that that was correct. That there was, in fact, a violation of 148A as soon as he refused the lawful command to drop the weapon. Also, Your Honor, you heard the statement that they immediately escalated to deadly force. Well, the complaint itself contradicts that. They tried verbal commands multiple times to no avail. Then they tried intermediate force, the use of a taser. And that's a key distinction between many of the cases plaintiff relies on. And this one is that there was an effort made at intermediate force which admittedly failed. And all the officers knew that that had failed prior to deadly force being utilized. So what happens is they try intermediate force. It fails. But the suspect, Mr. Strickland, presumably because of the taser attempt, brings the weapon up and points it toward an officer. Officer says, don't point that at us. He lowers it and then raises it again. And at that point, he's shot and killed. So he's not only given the benefit of multiple warnings prior to the taser attempt, he's given another warning between the taser attempt and the firing of the gun. So these distinctions are critical because when we look at the case law and whether we do it on the first prong of qualified immunity in terms of was there a constitutional violation, or we look at it in terms of was there a clearly established right to life in this factual setting, the answer that we are compelled to come up with is no. Because in every case that we look at, we see a victim who's either unarmed or who never brandishes the weapon, or where the weapon is such that it is of no threat to the officer, such as the case with pocket knife, where he only brandishes it against himself and the officers are far away. So for those reasons, there was nothing that put these officers on notice that in this factual setting, they were not entitled to use deadly force when a weapon capable of discharging a metal projectile was aimed at them at close range. Thank you. It's now time for the county's council. Thank you, council. Mr. Renick. Good morning, your honors. I represent Nevada County and the three individual defendants. As an initial matter, one of the defendants, Shannon Moon, is literally not mentioned at all in the plaintiff's opening brief. There's nothing that the plaintiff has raised that would suggest any basis to reverse the order as to her. And so that is just a somewhat procedural point here. One of the issues that was raised in the lower court, but that never got decided because of the judge's specific ruling, was the issue of qualified immunity. And I think, however, you look at these other issues that are being raised, and I will briefly address them as well, there is no case law that would have put these officers on notice. And in our answering brief, I cited at length two Supreme Court decisions. One of them, Rivas-Villegas, the Supreme Court pointed out that specificity is especially important in determining whether the case law is established in Fourth Amendment cases. And the issue is that notice that specific conduct was unlawful is necessary. And I also pointed to an earlier Supreme Court case, District of Columbia versus Wesby, where the court said identifying a case where an officer was acting under similar circumstances is essential to clearly establish law. And the essence of what the plaintiff is saying is that it is unconstitutional for these various officers to approach Mr. Strickland and attempt to disarm him. And there literally is no case law that he has cited to, that we're aware of, that comes close to suggesting that it was clearly established law that this was unlawful, much less unconstitutional. So on that basis alone, even if you didn't want to address the underlying questions, qualified immunity is completely appropriate here. But the underlying issue still requires affirmance here. Judge Bidey asked the question whether or not a failure to deescalate is a constitutional violation. And the answer, there's nothing here that would indicate this. Counsel for the plaintiff said there was no urgency here. Yet what we were dealing with was a mentally disturbed individual, by their own admission, who appeared to be armed with a real weapon. At the very least, the officers were not aware. There had been reports from civilians about Mr. Strickland on the streets with the weapon. There was an urgency. This was a residential area. If he chose to start firing the weapons, it wasn't just the officers who were potentially at risk. It was anybody in any of the houses around. The counsel also argued that it was premature to dismiss on a motion to dismiss. However, the issue that hasn't been raised so far is, what would have changed if this had gone beyond this? Counsel's argument in terms of why he should have been allowed to amend is he should have been allowed to conduct discovery. The case law is clear. You've got to state a viable cause of action before you get to conduct discovery. And at no point in the district even here has counsel indicated how he would amend the complaint to meet the problems that led the district judge to dismiss this case. So there's nothing premature about this. The facts that were admitted in the complaint are what drove this. I think unless the court has questions, we would submit at this point. Thank you very much, counsel. Mr. Dwyer. I think you're on, sir, you're on mute. I apologize. I'm sorry. No problem. Very quickly, a point was raised about policies. My brief discusses the cases where Ninth Circuit has specifically cited fair to follow policies as a factor, one of the grand factors in analyzing whether or not the 14. That's rebuttal to the brief by the Grass Valley. With regard to Shannon Moon, she was dismissed as were all the other cause of action because of the single initial ruling by Judge England that there was no constitution violation. Once that decision is set aside, then the argument about Shannon Moon dissipates. With regard to him having committed a crime, yes, it was a misdemeanor to refuse immediately to put down a gun. A misdemeanor refusing to obey a command is not grounds to use deadly force to kill him. So there was no significant crime in progress that would warrant the use of force. Going back to the key issue here for this court has to look at is, was it constitutional for the officers to proceed to use deadly force when they hadn't tried any of the other non-force means? At what case would tell us that the officers failing to use non-deadly force would result in liability once your client raised his gun? I think I cited about 10 different cases, Your Honor, in my briefs and I went through them repeatedly where you go through all the various grand factors and I went through these. I could but in Graham, the most telling thing, the sort of the bright line is once the officer's lives are threatened. No, I disagree, Your Honor. In Graham, there were four major factors that it cited. Was there an imminent threat to the officers? That's the first thing. And in this situation, there was no imminent threat until they marched down upon him, which was an unreasonable thing to do. Their actions were unreasonable and precipitating. Graham makes clear if there's no active crime in progress and there's no imminent threat, you really have very little basis for using lethal force. And we have to, as a society, we've got to look at this case from the point of view of, are officers going to be allowed to simply precipitate the use of force by ignoring all the tools for de-escalation available at their command? Our society doesn't want that. The public wants officers to be trained and know how to use de-escalation tools before they resort to lethal force. This has been a topic of discussion now for 10, 20 years in this country. And frankly, I think all the officers were very well informed that, in fact, they needed to use all the available tools before they resort to lethal force. The government... Counselor, you're over time if you want to wrap up. Any further questions we don't respond to, but I think I've covered everything. Thank you very much, Counselor. This case is submitted and we are adjourned for today. All rise.
judges: BYBEE, BUMATAY, Bennett